1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES CONRAD STULL,

11            Petitioner,              No. CIV S-05-1762 JAM KJM P

12        vs.

13   ROSEANNE CAMPBELL,

14            Respondent.          FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17   habeas corpus, challenging his Sacramento County conviction for possession of heroin while in

18   prison, a violation of California Penal Code § 4573.6, and the resulting three strikes sentence he

19   received of twenty-five years to life.

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

26   /////

1

I. <u>Background</u>

After a review of the record, this court accepts the Court of Appeal's factual summary as an accurate reflection of the evidence presented to the jury in this case:[1]

> On September 21, 1998, correctional officers at California State Prison Sacramento investigated four inmates for possession of controlled substances. As part of that investigation, a group of officers–including Sergeants Phillips and Minniefield and Officers Stotts, Roberts, and Duke–confronted defendant at the door to his cell and conducted a patdown search for contraband. The officers asked defendant to open his mouth, which he did, but when they asked him to lift his tongue, he told them he could not do so because he was "tongue-tied." The officers then escorted defendant to a holding cell, where he was strip searched. He was then taken to the medical clinic so a medical technician, Michelson, could search his mouth with a tongue depressor.
>
> Sergeant Phillips and Officers Roberts and Duke were present when Michelson searched defendant's mouth. Sergeant Phillips testified three bindles were extracted from defendant's mouth and noted in his report that defendant claimed to have swallowed a fourth bindle. Officer Roberts testified two bindles came out of defendant's mouth as Michelson was using the tongue depressor, defendant spit a third bindle into a paper towel Officer Roberts was holding, and defendant then made a gulping or swallowing gesture. Officer Duke testified Michelson retrieved two or three bindles from defendant's mouth. Michelson testified she saw four bindles in defendant's mouth, and three were either extracted or spit out and the fourth he swallowed.
>
> The bindles recovered from defendant's mouth were small squares of wrapped cellophane containing a brown substance. Officer Roberts gave them to Officer Stotts, who field tested the substance in the bindles. The substance tested positive for heroin. Later laboratory tests confirmed that one of the bindles contained 0.03 grams of heroin and a second bindle contained 0.02 grams of heroin. The third bindle did not contain a sufficient amount of the substance to test and therefore was not analyzed.

/////

---

[1] In his reply, petitioner takes issue with this summary, also cited in respondent's answer. Traverse at 1-2. He acknowledges that the answer relies on the Court of Appeal's recitation, but then argues that the trial court hampered his ability to present all the evidence of his factual innocence. He does not dispute that the Court of Appeal's account reflects the evidence presented at trial. This court rejects petitioner's objection to reliance on the Court of Appeal's summary and finds petitioner's contentions more appropriately addressed in a discussion of the issues presented by the writ.

1  From the medical clinic, defendant was taken to a holding cell,
2  then to the contraband watch area, where he was placed on body
   cavity surveillance, also known as "potty watch." On body cavity
3  surveillance, an inmate is kept under 24-hour surveillance and his
   feces is searched for contraband. [footnote omitted]

4  On September 25, Officers Machado and Phelps were on duty in
   the cavity surveillance room watching defendant and another
5  inmate. Defendant was allowed to defecate, and Officer Machado
   searched his feces for contraband, with Sergeant Rendon and
6  Officer Phelps watching. Officer Machado testified he found a
   piece of rolled up cellophane containing a whitish substance in
7  defendant's feces, and the other two officers testified they observed
   that discovery. Officer Shimmin was called to the surveillance
8  room to field test the substance and determined it was
   amphetamine. Laboratory tests later determined the substance was
9  0.06 grams of methamphetamine.

10 Defendant remained on body cavity surveillance until October 12.
   Officer Evans testified that on October 2, after defendant had been
11 undressed and placed on the portable toilet, he saw an object in
   defendant's hand, which defendant threw to the floor when Evans
12 asked what it was. [footnote omitted] Officer Evans retrieved the
   object, which he found to be two bindles covered by a single piece
13 of cellophane wrap. One bindle contained a white powdery
   substance and the other contained a brown tar-like substance.

14
   Although the substance in these bindles field tested positive for
15 heroin, subsequent laboratory tests determined the bindles did not
   contain any controlled substance, although one did contain a
16 chemical found in cough medicine.

17 Lieutenant Michaels (then Sergeant Michaels) testified he found a
   small bindle with a white powdery substance in defendant's feces
18 on October 4. Lieutenant Michaels field tested the substance,
   although he did not testify as to the results of that field test.
19 Laboratory tests later determined the bindle did not contain any
   controlled substance. A criminalist testified the substance might
20 be sugar or Ibuprofen.

21                     PROCEDURAL HISTORY

22 Defendant was charged in a single count with possessing heroin
   and methamphetamine while in prison between September 21 and
23 September 25, 1998. (Pen. Code § 4573.6.) The complaint, later
   deemed an information, also alleged defendant had 18 prior felony
24 convictions. Before jury voir dire, the trial on the prior conviction
   allegations was bifurcated from the trial on the possession charge.

25 /////

26 /////

                              3

1        At trial, defendant testified no bindles came out of his mouth in the medical clinic on September 21.  He also presented the testimony of the other inmate who was in body cavity surveillance on September 25.  That inmate claimed he saw Officer Machado make a motion like he was taking something out of his pocket before he claimed to have found the bindle in defendant's feces.  Regarding the incident on October 2, defendant claimed Officer Evans had lied because defendant did not have anything in his hand on that day and did not throw anything.  Defendant also testified that Lieutenant Michaels's testimony regarding his discovery of a bindle on October 4 was not true.  Defendant suggested Lieutenant Michaels was biased against him because several years earlier he had testified in a federal court case brought by another inmate against Michaels and others.

The court gave the jury verdict forms that allowed the jury to find defendant either guilty or not guilty of possessing "heroin and methamphetamine" as charged in the information.  According to page 48 of the written instructions, however, the verdict forms should have allowed the jury to find defendant either guilty or not guilty of "unlawful possession of heroin *and/or* methamphetamine."  (Italics added.)

When the jury returned its guilty verdict, the jury foreperson had lined through the word "and" on the verdict form between "heroin" and "methamphetamine" and had written in the word "or."  In explanation, the foreperson had written on the verdict form "per page 48 of jury instructions."  When the court later asked the jury whether they unanimously found defendant guilty of possessing heroin, methamphetamine, or both, all 12 jurors agreed they had found defendant guilty of possessing heroin.

The court sentenced defendant to a three strikes term of 25 years to life.

Lodged Document (Lodg. Doc.) No. 1 at 2-6.

        After the Court of Appeal affirmed petitioner's conviction, he sought review in the California Supreme Court, which denied his petition for review on October 30, 2002.  Lodg. Doc. No. 6.

        Thereafter petitioner unsuccessfully sought state habeas relief from the Court of Appeal and the California Supreme Court.  Lodg. Docs. 7-10.

/////

/////

1  II.  <u>Standards Under The AEDPA</u>

2            An application for a writ of habeas corpus by a person in custody under a

3  judgment of a state court can be granted only for violations of the Constitution or laws of the

4  United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

5  claim decided on the merits in state court proceedings unless the state court's adjudication of the

6  claim:

7            (1) resulted in a decision that was contrary to, or involved an
             unreasonable application of, clearly established federal law, as
8            determined by the Supreme Court of the United States; or

9            (2) resulted in a decision that was based on an unreasonable
             determination of the facts in light of the evidence presented in the
10           State court proceeding.

11  28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  <u>See</u> <u>Ramirez v. Castro</u>,

12  365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

13  under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

14  Amendment rights and that § 2254(d) does not preclude relief); <u>see also</u> <u>Lockyer v. Andrade</u>, 538

15  U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

16  not address the merits of petitioner's Eighth Amendment claim).[2]  Courts are not required to

17  address the merits of a particular claim, but may simply deny a habeas application on the ground

18  that relief is precluded by 28 U.S.C. § 2254(d).  <u>Lockyer</u>, 538 U.S. at 71 (overruling <u>Van Tran v.</u>

19  <u>Lindsey</u>, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

20  courts to review state court decisions for error before determining whether relief is precluded by

21  /////

22

23            [2]  In <u>Bell v. Jarvis</u>, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals
    held in a § 2254 action that "any independent opinions we offer on the merits of constitutional
24  claims will have no determinative effect in the case before us . . .  At best, it is constitutional
    dicta."  However, to the extent <u>Bell</u> stands for the proposition that a § 2254 petitioner may obtain
25  relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title
    28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation
26  of the Constitution before he or she may obtain habeas relief.  <u>See</u> <u>Lockyer</u>, 538 U.S. at 70-71;
    <u>Ramirez</u>, 365 F.3d at 773-75.

1  § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

2  by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

3       The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

4  different.  As the Supreme Court has explained:

5       A federal habeas court may issue the writ under the "contrary to"
        clause if the state court applies a rule different from the governing
6       law set forth in our cases, or if it decides a case differently than we
        have done on a set of materially indistinguishable facts.  The court
7       may grant relief under the "unreasonable application" clause if the
        state court correctly identifies the governing legal principle from
8       our decisions but unreasonably applies it to the facts of the
        particular case.  The focus of the latter inquiry is on whether the
9       state court's application of clearly established federal law is
        objectively unreasonable, and we stressed in Williams [v. Taylor,
10      529 U.S. 362 (2000)] that an unreasonable application is different
        from an incorrect one.

11

12  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

13  law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

14  fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

15  (2002).

16       The court will look to the last reasoned state court decision in determining

17  whether the law applied to a particular claim by the state courts was contrary to the law set forth

18  in the cases of the United States Supreme Court or whether an unreasonable application of such

19  law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

20  919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

21  of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

22  must perform an independent review of the record to ascertain whether the state court decision

23  was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

24  words, the court assumes the state court applied the correct law, and analyzes whether the

25  decision of the state court was based on an objectively unreasonable application of that law.

26  /////

1    It is appropriate to look to lower federal court decisions to determine what law has

2  been "clearly established" by the Supreme Court and the reasonableness of a particular

3  application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

4  III.  Truncated Opportunity To Present A Defense (Appeal Issues I & II)[3]

5    During the hearing on the motions in limine, defense counsel outlined his defense

6  theory:

7          . . . I believe that what occurred from September 21st . . . to
         October 12th and the three different incidents that occurred that
8         they . . . said showed controlled substances coming out of my
         client's feces, I have gone ahead and with expert testimony, with
9         expert evidence that I've tendered to the prosecution, shown that
         the likelihood of that is very, very small.
10

11  RT 28-29.  When the court asked if counsel was claiming that the officers had put drugs in

12  petitioner's mouth, counsel replied, "I would say that what the officers are saying is not credible.

13  . . . What they indicate that they found on September 21st they did not find."  RT 31.  The court

14  rephrased it as "it's all a part of one conspiracy, or your whole defense theory is all of this is not

15  true, it's fabricated, that they were out to get him and they did these different things. . . ."

16  Counsel agreed, "that's our theory of the defense . . . ."  RT 32.

17    To bolster this theory, defense counsel sought to introduce evidence that officers

18  charged petitioner with possessing a hypodermic syringe that had belonged to another inmate and

19  that the substance obtained from petitioner's feces on October 4 was ibuprofen, which had been

20  prescribed for and was given to petitioner for pain.  RT 535-550 (hypodermic), 636-651

21  (ibuprofen).  Petitioner challenges the trial court's refusal to allow him to present this evidence as

22

23    [3] Petitioner has listed the issues in this habeas petition by including a copy of the table of
24  contents from appellate counsel's opening brief; those issues are identified by Roman numerals I-
   IX. At the end of that table of contents, petitioner has typed in additional claims, those raised in
   the state habeas proceedings; those are identified by Roman numerals I-VIII.  This court will
25  refer to the arguments by Roman numeral, designated as either "Appeal" or "Habeas" issues.
      The court notes that respondent has not addressed many of the issues raised in this
26  proceeding that were raised on direct appeal.

7

1  a violation of his right to present his defense.  He also argues appellate counsel was ineffective in

2  failing to argue that trial counsel was ineffective in his unsuccessful attempt to have this evidence

3  admitted.

4       In general, a state court's evidentiary ruling is not subject to federal habeas review

5  unless the ruling violates federal law, either by infringing upon a specific federal constitutional

6  right or statutory provision or by depriving the defendant of the fundamentally fair trial

7  guaranteed by due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de

8  Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).

9       The Supreme Court has explored a criminal defendant's right to present a defense

10  in a cluster of cases.  In Washington v. Texas, 388 U.S. 14 (1967), the Court struck down a

11  Texas statute that forbade a defendant from calling a co-perpetrator as a witness.  The Court said

12  that the defendant's right to compulsory process was violated when the state enforced its

13  procedure preventing defendant from presenting a witness with relevant and material testimony.

14  Id. at 22.

15       In Chambers v. Mississippi, 410 U.S. 284 (1973), the Court reversed Chambers'

16  conviction because the trial court excluded, as hearsay, testimony from several witnesses

17  prepared to testify that a man named McDonald had confessed to the murder with which

18  Chambers was charged.  The Court found the state had applied its hearsay rule "mechanistically

19  to defeat the ends of justice" when it rejected the proffered evidence, which "bore persuasive

20  assurances of trustworthiness" and was "critical to Chambers' defense."  Id. at 302.

21       In Rock v. Arkansas, 483 U.S. 44 (1987), the Court considered a ruling permitting

22  the defendant to testify about killing her husband, but not to describe what she had remembered

23  during hypnosis.  The Court recognized that a state could not enforce a rule that "arbitrarily

24  excludes material portions of [a witness's] testimony" but recognized that "the right to present

25  relevant testimony is not without limitation."  Id. at 55-56.

26  /////

8

1        In United States v. Scheffer, 523 U.S. 303 (1998), the Court considered Military

2   Rule of Evidence 707, which made polygraph evidence inadmissible in court-martial

3   proceedings.  As it had in Rock, the Court examined the accommodation between a defendant's

4   right to present a defense and the government's interests in ensuring that reliable evidence is

5   presented and avoiding litigation collateral to the purpose of the trial.  Scheffer, 523 U.S. at 308-

6   09.  The Court observed that rules excluding evidence "do not abridge an accused's right to

7   present a defense so long as they are not arbitrary or disproportionate to the purposes they are

8   designed to serve."  Id. at 308 (internal quotations omitted).

9        The Court's most recent examination of a defendant's right to present a defense is

10   Holmes v. South Carolina, 547 U.S. 319 (2006).  In that case, the South Carolina court had

11   excluded evidence that another person had committed the murder with which Holmes was

12   charged because the strength of the prosecution's forensic evidence meant, in its view, that the

13   proffered third party culpability evidence did not raise a reasonable inference as to Holmes'

14   innocence.  The Court acknowledged that

15             well-established rules of evidence permit trial judges to exclude
             evidence if its probative value is outweighed by certain other
16             factors such as unfair prejudice, confusion of the issues, or
             potential to mislead the jury.
17

18   Id. at 326.  The Court ultimately found that the trial court erred in relying only on the

19   prosecution's evidence to gauge the relevance of the proffered defense testimony.

20        These cases show that while the Supreme Court is solicitous of a defendant's right

21   to present evidence germane to his theory of the defense, it has also expressed its "traditional

22   reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial

23   courts.  In any given criminal case the trial judge is called upon to make dozens, sometimes

24   hundreds, of decisions concerning the admissibility of evidence. . . . [T]he Constitution leaves to

25   the judges who must make these decisions wide latitude to exclude evidence that is repetitive . . .,

26   /////

only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.  Crane v. Kentucky, 476 U.S. 683, 989-90 (1986) (internal quotations omitted).

If the exclusion of evidence amounts to constitutional error, the erroneous exclusion of the evidence must have had "a substantial and injurious effect" on the verdict in order to justify federal habeas relief.  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).  Habeas petitioners must therefore establish that the error resulted in actual prejudice.  See id.

A.  Hypodermic Incident (Appeal Issue I)

On September 21, 1998, Correctional Officer Michael Duke was part of the team dispatched to take petitioner and three other inmates from their cells to determine whether they had drugs.  RT 535.  According to Duke, Officer Roberts put inmate Hill in a holding cell after searching it for contraband; when Hill was removed from that cell, officers found an inmate-manufactured hypodermic needle.  RT 536.  After this needle was removed from the cell, petitioner was placed in the cell.  Id.  When defense counsel asked if Hill had been "written up for that hypodermic kit," the court sustained the prosecutor's objection.  RT 540.  The court also sustained the prosecutor's objection when counsel asked Duke if petitioner "was charged with a hypodermic kit that was found in that cell."  RT 541.

Counsel then called Sergeant Minniefield, who supervised Duke and Roberts during the incident on September 21.  The court sustained the prosecutor's objection to counsel's questions about Hill's and petitioner's placement in a holding cell.  RT 543.

Outside the jury's presence, counsel made the following offer of proof:

My client was brought with three other people to that location.
What happened was–is on another inmate they found in a cell, that
my client had nothing to do with, think [sic] found this syringe.
Later on they had a hearing which indicated that–that was a hearing
for Hill and what happened at that hearing was they decided to
dump the case against Hill and they put the syringe on my client
despite the evidence to the contrary.

RT 548.  The court told defense counsel that the incident was not relevant and would just "muddy[] up the case, confuse[] the jury."  RT 549.  Counsel argued that it "goes to the

10

1    credibility of the officers."  Id.

2              The Court of Appeal rejected this contention:

3              [D]efense counsel's offer of proof was far too vague to establish
              the relevance of the proposed testimony.  Counsel was allowed to
4              elicit from Officer Duke testimony that an inmate-made
              hypodermic needle was found in a holding cell after Hill was
5              removed . . . and before defendant was placed there.  In his offer of
              proof, counsel then suggested he could elicit testimony that at "a
6              hearing for Hill . . . they decided to dump the case against Hill and
              they put the syringe on my client despite the evidence to the
7              contrary."  According to defense counsel, this evidence was
              relevant to "the credibility of the officers as to the incident on the
8              21st."  Due to its vagueness, however, the offer of proof fails to
              show any connection between the alleged decision to charge
9              defendant with possession of the syringe and the credibility of the
              three officers who testified they saw three bindles removed from
10             defendant's mouth on September 21.  Defense counsel did not
              offer to prove who it was who purportedly "decided to. . . put the
11             syringe on" defendant or what connection these unidentified
              individuals had to the four witnesses who testified about finding
12             the bindles in defendant's mouth.  That some unidentified "they"
              allegedly decided to charge defendant with possession of the
13             syringe does not have any tendency in reason to prove Sergeant
              Phillips and Officers Roberts and Duke–not to mention medical
14             technician Michelson–were all lying when they testified about the
              bindles found in defendant's mouth.

15             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

16             . . . If defendant had evidence Sergeant Phillips and Officers
              Roberts and Duke were the otherwise unidentified "they" who
17             were responsible for falsely charging him with possessing the
              syringe, there is no reason to believe the trial court would not have
18             allowed him to elicit that evidence before the jury if defendant had
              made that evidence apparent to the trial court in a specific offer of
19             proof.

20

21    Lodg. Doc. 1 at 10-12.[4]

22             The state courts did not exclude this evidence as the result of a mechanistic or

23    arbitrary rule of evidence, but rather considered trial counsel's offer of proof and found that it

24    _____

25        [4]  Respondent has not addressed this claim directly although she has answered the related
      claim of ineffective assistance of appellate counsel.  She has therefore waived any claim that trial
      counsel's failure to make an adequate offer of proof constitutes procedural default.  Batchelor v.
26    Cupp, 693 F.2d. 859, 864 (9th Cir. 1982).

                                          11

1  lacked sufficient detail to make it relevant to the frame-up defense petitioner pursued.  As the

2  Court of Appeal noted, defense counsel attributed the incident to an unnamed, unidentified

3  "they" but did not explain "their" connection to those who found the bindles in his mouth.

4  LaGrand v. Stewart, 133 F.3d 1253, 1267 (9th Cir. 1998) (no error when state courts did not

5  apply mechanistic or arbitrary rules but rather evaluated the proffer and found it unreliable).

6  Trial counsel was unable to connect this claim of alleged malfeasance by unspecified officers to

7  the credibility of those who had been present when the bindles were extracted from petitioner's

8  mouth.

9          In his traverse, petitioner identifies a Lieutenant Moore as the correctional official

10  who dismissed the disciplinary charges against Hill and charged petitioner with the possession of

11  the syringe two months after the bindles were found in petitioner's mouth.  Traverse at 13.  This

12  belated offer does not advance the claim, for this information was not presented to the state

13  courts and, even now, petitioner does not demonstrate or even suggest any connection between

14  Moore's alleged action in November and the incident in September.

15          The state court did not apply federal law unreasonably in rejecting this claim.

16          B.  Ibuprofen (Appeal Issue II)

17          On October 4, Sergeant Michaels retrieved a small cellophane bindle containing a

18  white powdery substance from petitioner's feces.  RT 427-428.  The prosecution's criminalist

19  determined the powder was not a controlled substance and agreed it might be Ibuprofen.  RT 501.

20          Over defense objection, the prosecutor called Correctional Officer Buda as an

21  expert witness about drug trafficking in prison.  RT 462-463, 468.  Buda testified that inmates

22  who sell drugs in prison sometimes sell phony drugs, known as bunk, in place of or in addition to

23  the real thing.  RT 481-482.  He acknowledged, though, that it would be uncommon for an

24  inmate to possess three bindles of drugs and a fourth of bunk at the same time.  RT 482.

25          Defense counsel sought to call a forensic chemist to testify that the bindle

26  petitioner excreted on October 4 contained Ibuprofen, which had been prescribed for petitioner.

1  RT 636.  He argued that this testimony was necessary in light of Buda's testimony about bunk.

2  RT 637.  Counsel also argued that because Lieutenant Michaels classified it as methamphetamine

3  after a field test, the fact that it was actually Ibuprofen supported the defense theory of a

4  retaliatory conspiracy against petitioner.  RT 646-648.  The trial court ruled that the testimony

5  was not relevant and confused the issues in the case.  RT 651.

6          The Court of Appeal rejected the claim of error:

7          We conclude the trial court did not err in excluding the Ibuprofen
        evidence and that, in any event, exclusion of the evidence was
8          harmless.  First, defendant fails to explain why Ibuprofen, reduced
        to a powder and wrapped in a cellophane bindle, could not be
9          considered "bunk," i.e., a phony narcotic.  Furthermore, that
        defendant was taking Ibuprofen while in body cavity surveillance
10         does not explain why Ibuprofen was found *inside a cellophane
        bindle* in defendant's feces.  For these reasons, the Ibuprofen
11         evidence would not have countered any inference that may have
        arisen from Officer Buda's testimony that defendant was in
12         possession of "bunk" as well as actual narcotics.

13         As for defendant's claim the Ibuprofen evidence would have
        tended to impeach Lieutenant Michaels's credibility and thereby
14         somehow called [sic] into question the discovery of
        methamphetamine in the bindles recovered on September 25, even
15         if that were so it would not compel reversal of defendant's
        conviction.  This is so because the jury expressly acknowledged its
16         guilty verdict was based only on defendant's possession of heroin
        from the bindles found in his mouth on September 21, not on his
17         alleged possession of methamphetamine from the bindles
        recovered on September 25.  Defendant fails to explain how
18         impeaching Lieutenant Michaels's credibility regarding the bindles
        on October 4 would have any effect on the credibility of the four
19         witnesses who testified to the discovery of the bindles in
        defendant's mouth on September 21.

20

21  Lodg. Doc. 1 at 13-14.

22          Once again, this court cannot find that the state courts applied federal law

23  unreasonably in rejecting this claim.  As with the hypodermic evidence, the trial court evaluated

24  the proffer rather than relying on arbitrary rules to exclude the evidence.  And, as with the

25  hypodermic evidence, the court's relevance finding is supported by the record.  As the Court of

26  Appeal recognized, if the purpose of the Ibuprofen evidence was to counter the prosecution's

13

1   suggestion that this was "bunk," it fell short, for proof that the substance was Ibuprofen does not

2   otherwise explain why it was excreted wrapped in a cellophane bindle.  Moreover, as noted

3   above, the state's criminalist testified that the white powder could have been Ibuprofen and the

4   jury learned that petitioner was taking Ibuprofen during the body cavity surveillance.  RT 501,

5   728.

6          The evidence was not relevant for a more basic reason:  Although defense counsel

7   elicited the fact that Michaels had tested the white powder he recovered on October 4, he never

8   asked Michaels the result of the test.  RT 436.  Evidence that the substance was Ibuprofen would

9   not have shown Michaels' bias in the absence of Michaels' testimony or other evidence showing

10  the field test he performed was positive for methamphetamine.

11         In addition, the fact that Lieutenant Michaels may have identified the substance he

12  subjected to a field test on October 4 as methamphetamine rather than Ibuprofen may have

13  suggested his own bias against petitioner; it did not necessarily show that the entire investigation

14  was tainted by his alleged animus against petitioner, as the state court found.

15  IV.  Prosecutorial Misconduct; Improper Testimony; Trial Court Error (Appeal Issues III, IV, V)

16         The standard of review for prosecutorial misconduct in federal habeas cases is

17  "the narrow one of due process, and not the broad exercise of supervisory power."  Donnelly v.

18  DeChristoforo, 416 U.S. 637, 642 (1974).  To prevail on a claim of prosecutorial misconduct,

19  petitioner must show the conduct "so infected the trial with unfairness as to make the resulting

20  conviction a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  "To

21  constitute a due process violation, the prosecutorial misconduct must be 'of sufficient

22  significance to result in the denial of the defendant's rights to a fair trial.'"  Greer v. Miller, 483

23  U.S. 756 (1987) (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).  Moreover, even if

24  an error of constitutional magnitude is found, it will be held harmless unless petitioner can show

25  that it "had a substantial and injurious effect or influence in determining the jury's verdict" or that

26  it involved "a deliberate and especially egregious error" or "combined with a pattern of

1  prosecutorial misconduct, might so infect the integrity of the proceeding" as to warrant habeas

2  relief.  Brecht, 507 U.S. at 638 n.9 (1993).

3       A state court's evidentiary ruling is not subject to federal habeas review unless the

4  ruling violates federal law, either by infringing upon a specific federal constitutional or statutory

5  provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.

6  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20

7  (9th Cir. 1991).  A federal court cannot disturb a state court's decision to admit evidence on due

8  process grounds unless the admission of the evidence was "arbitrary or so prejudicial that it

9  rendered the trial fundamentally unfair."  See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir.

10  1995).  Under Ninth Circuit law, the admission of "other acts" evidence violates due process only

11  if there were no permissible inferences the factfinder could have drawn from the evidence.  See

12  McKinney v. Rees, 993 F.2d 1378, 1381 (9th Cir. 1993) (question is "whether any inferences

13  relevant to a fact of consequence may be drawn from each piece of the evidence, or whether they

14  lead only to impermissible inferences about the defendant's character").

15       As with prosecutorial misconduct, in order to grant relief, the habeas court must

16  find that the evidentiary error had "'a substantial and injurious effect' on the verdict."

17  Brecht, 507 U.S. at 623.

18       A.  Captain Grannis's Testimony About Petitioner's Drug History (Appeal
19           Issue III)

20       After Captain Grannis testified at a pretrial hearing, the trial court told her that

21  "there's certain things we don't want you to say. . . about the defendant . . .in open court to the

22  jury.  So the D.A. will be advising you of that."  RT 103.  Later, meeting with counsel, the court

23  said, "She said a couple of things about he's a known drug user in prison . . . . Those are the

24  kinds of things I don't want her to say.  I know he's a heavy drug user or we've caught him

25  before or we've suspected him for so many years."  RT 166-167.

26  /////

1    During his cross-examination of Lieutenant Michaels, counsel asked about a rules

2  violation report alleging petitioner's possession of alcohol Michaels wrote ten days before the

3  charged crime. RT 455. The prosecutor argued this line of questioning opened the door to

4  questions about petitioner's drug use. RT 460. The court disagreed: "[I]t's far more prejudicial

5  than probative. It's sufficient for the captain to say just what this lieutenant said. They're aware

6  of his background and his history and they made a decision based on that. I don't think we need

7  to go into details." RT 461.

8    When Grannis took the stand, the prosecutor asked what she considered in

9  deciding to keep petitioner on body cavity surveillance for twenty-one days. She said:

10
11        I considered . . .the information that I had received. I considered
         the fact that when searched, he was found to be in possession of
         contraband which was later determined to be narcotics, and the fact
12        that he had admitted to swallowing one of the bindles and we had
         recovered three other bindles. I also considered his extensive
13        history of similar things.

14  RT 511. Defense counsel's objection and motion to strike were overruled. Id.

15    Then, during his cross-examination of Grannis, defense counsel asked her again

16  how she determined when to release an inmate from body cavity surveillance. Grannis

17  responded that the "decision is based on the sum total of information," which included "a history

18  of drugs." RT 532. The court intervened and asked counsel to "move to a different area." Id.

19    During a recess, counsel said he thought "we instructed [Grannis]. . . not to testify

20  as to the history of similar things." RT 550-551. The trial court said

21        the instruction to her was not going into any other specific
         incidents. That's all. She said other similar things. Similar things
22        could be a million problems that he's created out there. I don't
         know. We heard last week about the alcohol. I just think that, you
23        know, the evidence is in.

24  RT 551.

25  /////

26  /////

16

1          Appellate counsel argued that the prosecutor's failure adequately to control

2   Grannis's testimony constituted misconduct.  The Court of Appeal rejected the claim:

3              [T]here is nothing in the record to suggest the prosecutor
               committed misconduct by failing to warn Captain Grannis of the
4              court's ruling regarding the permissible scope of testimony about
               defendant's drug use history in prison.  The prosecutor specifically
5              raised the issue before trial because he "want[ed] to make sure [he]
               underst[oo]d so that [he could] inform her correctly."  Defendant
6              fails to point to anything in the record indicating the prosecutor did
               not follow through and inform Captain Grannis of the court's
7              ruling.  Furthermore, the prosecutor did not specifically solicit . . .
               the testimony about defendant's "history of similar things."
8              Instead, Captain Grannis listed this as one of several factors she
               took into account in continuing defendant's body cavity
9              surveillance.  Because there is no evidence the prosecutor
               knowingly solicited this response, even assuming Captain
10             Grannis's statement was objectionable, defendant has failed to
               show any prosecutorial misconduct connected with that testimony.

11
               Defendant contends that "even if the officer's comments were
12             considered inadvertent . . . , a witness' volunteered statement may
               also provide a basis for error". . . . .
13
               . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
14             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

15             [T]he trial court's intent was to limit Captain Grannis from
               testifying as to the "details" of defendant's history of substance
16             abuse in prison, because going through defendant's drug history
               "chapter and verse" would be more prejudicial than probative.
17             Because Captain Grannis's testimony did not venture into the
               details of defendant's "history of drugs," the trial court reasonably
18             could have determined that Captain Grannis's testimony did not
               violate the court's earlier ruling.  In any event, . . . any error in
19             allowing that testimony was harmless.  We find no reasonable
               probability the jury would have acquitted defendant of the heroin
20             possession charge if Captain Grannis had not been allowed to
               testify defendant had a "history of similar things" and a "history of
21             drugs."

22   Lodg. Doc. 1 at 27-29.

23          A prosecutor's failure to prevent a witness from volunteering inadmissible

24   information may rise to the level of misconduct.  United States v. Percy, 250 F.3d 720, 729 (9th

25   Cir. 2001).  Petitioner, however, has not met the underlying factual predicate of his claim:

26   nothing in the record before this court or before the state courts suggests that the prosecutor

failed to inform Grannis of the trial court's ruling.

Repackaging the claim as one of misconduct by the witness does not change the result. The trial court's ruling precluded Grannis's testimony about the specifics of petitioner's drug use and possession in prison. RT 166, 551. Grannis's initial statement, that she considered his history of "similar things," falls within the ruling. Her second statement, about petitioner's history of drugs, seems to be close to, if not over, the line drawn by the trial court's ruling. However, even if the testimony can be construed as violating the trial court's order and presenting inadmissible information to the jury, this court cannot find a constitutional violation. The introduction of evidence of a defendant's other crimes or wrongs cannot support habeas relief unless it "so infused the trial with unfairness as to deny due process of law." Lisenba v. California, 314 U.S. 219, 288 (1941). In this case, Grannis's reference to petitioner's history of drugs does not rise to this level in light of petitioner's own concession that he had been charged with a number of disciplinaries based on inmate-manufactured alcohol, RT 770-771, had in fact made alcohol and consumed it, RT 777, and his admission that he had used heroin in the past. RT 782.

### B. Cross-Examination Of Petitioner (Appeal Issues IV & V)

Petitioner claims the prosecutor improperly cross-examined him on three subjects and that the trial court erred in overruling his objections to these lines of questioning.

#### 1. Disciplinary Problems

The prosecutor asked petitioner if he had had prior problems with Officer Machado or if Machado had been a witness against petitioner at a disciplinary hearing; petitioner denied as much. RT 768-769. The prosecutor persisted: "[Y]ou never went to a hearing where Officer Machado said, well, I found Mr. Stull with heroin or I found Mr. Stull with a syringe or alcohol?" RT 769. Defense counsel's objection was overruled. Id.

The prosecutor then asked if Evans had written him up for "pruno," inmate-manufactured alcohol; petitioner said "he probably has. I know he's written me up a few times.

1  A lot of my write-ups have been for pruno, . . ." RT 770.  He said, however, that he had never

2  had a disciplinary hearing with Phelps.  RT 771.

3         The trial court denied petitioner's motion for a mistrial, finding the questions

4  proper.  RT 787.

5         The Court of Appeal rejected plaintiff's claim of error:

6         . . . Evidence that defendant had no past disciplinary problems with
       these officers was relevant to show an absence of bias on the part
7       of the officers.  Thus, the prosecutor's inquiry into defendant's past
       disciplinary problems with the officers who had testified against
8       him was not objectionable on relevance grounds.

9         Referring specifically to the prosecutor's question about . . . heroin
       defendant contends evidence of past heroin use was irrelevant or at
10      least inadmissible because . . . [of its] prejudicial effect.  The
       prosecutor's question, however, did not elicit any evidence of past
11      heroin possession, because defendant testified he could not
       remember any such hearing involving Officer Machado. . . .
12      [T]here was no evidentiary error in eliciting defendant's denial that
       Officer Machado had ever testified . . . about finding defendant in
13      possession of heroin.

14  Lodg. Doc. 1 at 17-19 (quotation omitted).

15         A prosecutor may commit misconduct by "presenting otherwise inadmissible

16  evidence through artful cross-examination."  United States v. Cabrera, 201 F.3d 1243, 1247 (9th

17  Cir. 2000).  In this case, however, petitioner's history of disciplinary run-ins with the officers

18  involved in the incident of September 21 was relevant both to those witnesses' bias (or its

19  absence) against petitioner and to petitioner's bias against them, which might undercut the

20  defense theory.   Because there were permissible inferences the jury could draw from the

21  evidence of petitioner's disciplinary history with the officers involved in the September 21

22  incident, admission of this evidence did not render his trial fundamentally unfair.

23  /////

24  /////

25  /////

26  /////

1    The appellate court found the prosecutor's question about whether Machado had

2 sought disciplinary sanctions against petitioner for heroin improper, but found the error harmless:

3        . . . Generally, "[a] prosecutor's conduct violates the Fourteenth
         Amendment . . . [only] when it infects the trial with such
4        unfairness as to make the conviction a denial of due process.
         Here, other evidence properly before the jury revealed defendant
5        had a history of drug use in prison and had used heroin before.
         Under these circumstances, the prosecutor's isolated question
6        implying defendant had possessed heroin in prison on a prior
         occasion, coming as it did in the midst of five days of testimony by
7        40 witnesses, did not render the trial so fundamentally unfair as to
         violate defendant's right to due process.

8

9 Lodg. Doc. 1 at 33 (internal citation omitted).

10    The court did not apply federal law unreasonably in reaching this conclusion.

11 Although it relied on state law in concluding that the question had not rendered the trial

12 "fundamentally unfair," the standard it employed echoes the federal test: did the misconduct "so

13 infect[] the trial with unfairness" as to rise to a due process violation. <u>Darden</u>, 477 U.S. at 181.

14 Its application of the standard is similarly reasonable, for it relied on the fact that the question

15 was an isolated one in several days of testimony, a standard also embraced by the Supreme

16 Court. <u>Donnelly</u>, 416 U.S. at 645; <u>Humphries v. Ozmint</u>, 397 F.3d 206, 218 (4th Cir. 2005).

17        2. <u>Subsequent Body Cavity Surveillance</u>

18    During pretrial proceedings, the prosecutor noted his rebuttal case might include

19 evidence of a body cavity surveillance of petitioner in October 1999, a year after the charged

20 incident.  RT 43-44.  The trial judge said he wanted to move the case along, but would not

21 automatically cut off the prosecution's response to petitioner's defense theory.  RT 50-52.

22    When the issue was raised a second time, the court said that "[w]hether it comes

23 in later or not is something we can argue at that time according to the testimony."  RT 205.  It

24 noted that the evidence might be relevant to show how petitioner was able to secrete contraband.

25 <u>Id</u>.

26 /////

1     Later during trial, the prosecutor asked petitioner if he had ever hidden a balloon

2  in his nose; petitioner denied as much.  RT 778.  He then asked if petitioner had been on body

3  cavity surveillance in October 1999 and whether the incident had involved his secretion of a

4  balloon in his nose and then in his throat; petitioner acknowledged the second body cavity

5  surveillance, but denied that he had a balloon in his nose or throat.  RT 780.

6     Out of the jury's presence, defense counsel moved for a mistrial.  RT 785.  The

7  court found the questions to be proper cross-examination.  RT 787.  On redirect, petitioner

8  testified that no balloon was recovered from his nose or throat and that X-rays were taken.  RT

9  791.

10     During the rebuttal case, the prosecutor sought to introduce evidence of the

11  progress of the subsequent body cavity surveillance.  The court then realized the surveillance the

12  prosecution was probing had occurred in 1999 rather than 1998 and found it to be irrelevant and

13  more prejudicial than probative.  RT 888-889.

14     The Court of Appeal rejected the claim of error:

15        . . . The only evidence that was elicited . . . was defendant's
          testimony he had never put a balloon-type object in his nose and
16        did not have a balloon in his nose or throat in the incident leading
          to the subsequent body cavity surveillance in 1999, . . . .  Evidence
17        that defendant *had* secreted a balloon in his nose, which the
          prosecutor sought to offer in his rebuttal case, never came in
18        because the trial court concluded it was more prejudicial than
          probative. . . . [I]t is sufficient to conclude there was no evidentiary
19        error in eliciting defendant's denial that he had secreted a balloon
          in his nose.

20

21  Lodged Doc. No. 1 at 19-20.

22     These factual findings are not an unreasonable interpretation of the record: when

23  asked, petitioner said he had once shown a cell-mate how to secrete a razor blade in his nose as a

24  hedge against the violence of the segregation unit.  RT 777-778.  This evidentiary event did not

25  render the trial fundamentally unfair.

26  /////

1          The Court of Appeal did not specifically address petitioner's claim that the

2    prosecutor's questions about body cavity surveillance elicited evidence about the 1999 event; the

3    record reflects petitioner admitted being placed on a subsequent surveillance, but that no further

4    evidence about the episode was admitted. RT 780-781.  Petitioner's admission that he had been

5    placed on the subsequent surveillance does not warrant habeas relief, even on a de novo review

6    of the issue.  The jury might use the evidence of the subsequent surveillance as propensity

7    evidence, but it might also conclude that it showed the authorities' harassment of petitioner, as he

8    claimed.  The brief reference to the subsequent body cavity surveillance did not render

9    petitioner's trial fundamentally unfair in light of the four witnesses who described finding the

10   bindles in petitioner's mouth and petitioner's concession he was "not an angel."  RT 777.

11         The state appellate court also found this incident did not constitute prosecutorial

12   misconduct:

13              . . . The prosecutor told the court and defense counsel about
                testimony he anticipated presenting in his rebuttal case, "depending
14              on what happens with the defense case," and the trial court told the
                prosecutor, "[w]hether it comes in later or not is something we can
15              argue at that time according to the testimony."  This comment by
                the court, in response to the prosecutor's explanation of what
16              evidence he might present in his rebuttal case, cannot reasonably
                be construed as addressing the prosecutor's cross-examination of
17              defendant, let alone as constituting a ruling limiting the scope of
                that cross-examination. . . . Accordingly, the prosecutor did not
18              commit misconduct by cross-examining defendant about the
                balloon incident without first seeking a ruling from the court . . . .
19

20   Lodg. Doc. 1 at 37-38.

21         A prosecutor may commit misconduct by questioning a defendant in violation of

22   an in limine or other ruling.  Thomas v. Hubbard, 273 F.3d 1164, 1177 (9th Cir. 2001), overruled

23   on other grounds, Payton v. Woodford, 346 F.3d 1204 (9th Cir. 2003).  In this case, however, the

24   Court of Appeal did not err in finding the trial court had not clearly prohibited the prosecutor

25   from asking about any subsequent incidents.  As the record shows, the trial court considered the

26   parties' arguments and ruminated, "whether it comes in later or not is something we can argue at

that time according to the testimony." RT 205.  As there was no clear prohibition against

introducing such evidence, the prosecutor's questions about the incident were not misconduct.

### 3. Heroin Use

After asking petitioner about the 1999 body cavity surveillance, the prosecutor

asked petitioner if he had ever used heroin; petitioner said he had, but denied using it in October

1998.  RT 782.  During the motion for a mistrial, the court found the question about heroin use

was typical cross-examination and was not damaging to petitioner in light of petitioner's

testimony about his convictions and his disciplinaries for pruno.  RT 787-788.

The Court of Appeal found no evidentiary error:

> . . . Just because the circumstances under which defendant was
> alleged to have possessed the bindles of heroin were relevant to
> prove his knowledge the bindles contained narcotics does not mean
> his prior heroin use was *irrelevant* to prove that fact.  Indeed, the
> evidence inmates sometimes traffic in phony drugs, and evidence
> defendant had bindles in his system that did *not* contain narcotics,
> could have raised some doubt about defendant's knowledge that
> the substance in the bindles found in his mouth on September 21
> was heroin . . . .Accordingly, the trial court did not abuse its
> discretion in allowing the prosecution to elicit testimony about
> defendant's heroin use.

Lodg. Doc. 1 at 23 (emphasis in original).  Nor did the court find any prosecutorial misconduct:

> . . . Defendant contends the prosecutor's questions about
> defendant's heroin use constituted misconduct because "the court
> clearly indicated that evidence of previous drug use . . .was
> inadmissible."  We find no such ruling in the record. . . . By no
> stretch of the imagination can that ruling [as to Grannis's
> testimony] be reasonably construed as a ruling that the prosecutor
> could not ask defendant whether he had ever used heroin.  Thus,
> the prosecutor's questions regarding defendant's heroin use did not
> violate any ruling by the trial court and therefore did not constitute
> misconduct.

Lodg. Doc. 1 at 38-39.

The Court of Appeal did not apply federal law unreasonably in reaching these

conclusions.  Evidence of a defendant's prior involvement with drugs may be relevant to show

knowledge of the nature of the substance.  United States v. Howell, 231 F.3d 615, 628 (9th Cir.

1   2000).  Because the jury could draw a permissible inference from the evidence, its admission did

2   not violate clearly established federal law.  McKinney, 993 F.2d at 1381.

3         Moreover, petitioner has not pointed specifically to any blanket ruling forbidding

4   inquiry into his heroin use.  He refers to the court's restrictions on Grannis's testimony, but those

5   rulings simply prohibited the prosecutor from eliciting that petitioner was a heavy drug user or

6   any details of petitioner's drug history in prison.  RT 166.  Accordingly, the Court of Appeal did

7   not violate clearly established federal law in finding that the question about petitioner's heroin

8   use did not constitute misconduct.

9   V.  CALJIC No. 2.03 (Appeal Issue VI)

10        Over defense objection, the trial court decided to include CALJIC No. 2.03 with

11  its instructions to the jury, finding that the instruction was justified by petitioner's statement to

12  the officers that he could not lift his tongue any higher because he was tongue-tied.  RT 801.

13        The version the court read to the jury, however was garbled:

14        If you find that before this jury the defendant made a willfully false
          or deliberately misleading statement concerning the crime for
15        which he is now being tried, you may consider that statement as a
          circumstance tending to prove a consciousness of guilt.  However,
16        that conduct is not sufficient by itself to prove guilt and its weight
          and significance, if any, are for you to decide.

17

18  RT 918.[5]

19        The Court of Appeal found any error in giving the instruction to be harmless:

20        Defendant first suggests the error is of federal constitutional
          dimension because "[j]ury instructions relieving States of [the
21        burden of proof beyond a reasonable doubt] violate a defendant's
          right to due process."  While the latter part of defendant's assertion
22        may be true, that rule has no application here because the allegedly
          erroneous instruction in this case did not relieve the People of their
23        burden of proof.  At most, any error in instructing the jury with
          CALJIC No. 2.03 was an error of California law only, because the

24

_____

25        [5] The instruction should have instructed the jury to consider any false or misleading
    statements made "before this trial."  Petitioner does not argue that this version of the instruction
26  caused any additional error than that he ascribes to the instruction itself.  Pet. at 77-83.

24

1   instruction was not supported by the evidence produced at trial.
    Under California law, "[a]n appellate court cannot set aside a
2   judgment on the basis of instructional error unless, after an
    examination of the entire record, the court concludes that the error
3   has resulted in a miscarriage of justice. [Citation.] A miscarriage of
    justice occurs only when it is reasonably probable that the jury
4   would have reached a result more favorable to the appellant absent
    the error."
5
    Based on our examination of the entire record, we do [not][6] find it
6   reasonably probable the jury would have acquitted defendant of
    possessing heroin if CALJIC No. 2.03 had not been given.
7

8   Lodg. Doc. 1 at 41-42 (citation omitted).

9          Claims of error in state jury instructions are generally a matter of state law and

10  thus do not usually raise a constitutional question.  Hayes v. Woodford, 301 F.3d 1054, 1086 (9th

11  Cir. 2002).  It is not the province of a federal habeas court to reexamine state court

12  determinations of state law questions.  Estelle v. McGuire, 502 U.S. 62, 68 (1991); Gilmore v.

13  Taylor, 508 U.S. 333, 348-49 (1993).

14         In order to warrant federal habeas relief, a challenged jury instruction cannot be

15  merely "undesirable, erroneous, or even universally condemned, but must violate some due

16  process right guaranteed by the Fourteenth Amendment."  Cupp v. Naughten, 414 U.S. 141, 146

17  (1973).  A violation of due process occurs if a trial is fundamentally unfair.  Estelle, 502 U.S. at

18  72-73; Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).  In making this determination, a

19  reviewing court should not view the challenged instruction in isolation, but must consider it in

20  the context of the instructions as a whole and the entire trial process.  Id.  If the court does find

21  constitutional error, the court must also find the error had a substantial and injurious effect or

22  influence in determining the jury's verdict before granting relief in habeas proceedings.  See

23  Calderon v. Coleman, 525 U.S. 141, 146-47 (1998).

24  /////

25  _____

26         [6]  Although the word "not" has been left out of the sentence in the original, the omission
    is inadvertent, based on the rest of the paragraph.

1       The state appellate court's determination is neither contrary to nor an

2    unreasonable application of controlling federal law.  First, this court will not revisit the Court of

3    Appeal's determination that giving the instruction was an error of state law.  Second, in Turner v.

4    Marshall, 63 F.3d 807, 820 (9th Cir. 1995), the Ninth Circuit wrote: "so long as the instruction

5    does not state that inconsistent statements constitute evidence of guilt, but merely states that the

6    jury may consider them as indicating consciousness of guilt, the instruction would not violate

7    constitutional rights."  CALJIC No. 2.03 provides that "[such] conduct is not sufficient by itself

8    to prove guilt, and its weight and significance . . . are for [the jury] to decide."  RT 918.

9    Accordingly, because the instruction did not tell the jury it was bound to use any statements as

10   evidence of consciousness of guilt, there was no federal constitutional error.

11   VI.  Ineffective Assistance Of Trial Counsel (Appeal Issue VII)

12       Petitioner argues trial counsel was ineffective for failing to object when the

13   prosecutor asked petitioner if various witnesses had been lying, and for failing to object to those

14   portions of the prosecutor's summation and rebuttal, that constituted vouching and asked the jury

15   to draw inferences from the lack of certain evidence that had been excluded.

16       The federal law on claims of attorney ineffectiveness is clear:

17           First, the defendant must show that counsel's performance was
             deficient.  This requires showing that counsel made errors so
18           serious that counsel was not functioning as the 'counsel'
             guaranteed by the Sixth Amendment.  Second, the defendant must
19           show that the deficient performance prejudiced the defense.

20   Strickland v. Washington, 466 U.S. 668, 687 (1984).  "[T]he performance inquiry must be

21   whether counsel's assistance was reasonable considering all the circumstances."  Id. at 688.  It is

22   also petitioner's burden to establish prejudice:  "A defendant must show that there is a reasonable

23   probability that, but for counsel's unprofessional errors, the result of the proceeding would have

24   been different.  A reasonable probability is a probability sufficient to undermine confidence in

25   the outcome."  Strickland, 466 U.S. at 694.  "We strongly presume that counsel's conduct was

26   within the wide range of reasonable assistance, and that he exercised acceptable professional

26

1   judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990)

2   (citing Strickland, 466 U.S. at 689).  Moreover, a reviewing court "need not determine whether

3   counsel's performance was deficient before examining the prejudice suffered by the defendant as

4    a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the

5   ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280

6   F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

7        A.  Questions About Witness Credibility

8            During cross-examination, petitioner agreed that no bindles were removed from

9   his mouth in the infirmary.  The following exchange occurred:

10           Q: So Nurse Michelson came to court and lied about that?

11           A: They all came to court and lied about it. . . .

12           Q: So your testimony, just to be clear– and I don't want to lump
             people together too much.  Nurse Michelson came to court and
13           perjured herself about finding bindles in your mouth?

14           A: She did.

15   RT 753-754.

16           The Court of Appeal agreed that the prosecutor erred in asking petitioner whether

17   the prosecution witnesses had lied.  Lodg. Doc. 1 at 44-45.  It rejected the claim of incompetence

18   of counsel nevertheless:

19               . . . Defendant's entire defense in this case was that he had never
                 possessed any of the contraband or suspected contraband he was
20               accused of possessing.  By necessity, defendant had to take the
                 position that all of the prosecution witnesses who testified he *did*
21               have the contraband were lying.  Moreover, even on direct
                 examination, defendant expressed his disagreement with the
22               testimony of many of the prosecution's witnesses, and several
                 times he said that testimony was "not true" or that the witnesses
23               had "lied" or "fabricated" their testimony.  Defense counsel may
                 well have reasonably decided that objecting to the prosecutor's
24               cross-examination about whether prosecution witnesses had lied
                 would have served no valid purpose given defendant's theory of
25               the case and his testimony on direct examination.

26   /////

1

> In any event, defendant has failed to demonstrate any prejudice that resulted from his counsel's failure to object. As noted, that the prosecution witnesses were lying was defendant's theory of the case. Defendant does not explain how testimony directly supporting his theory of the case can be considered prejudicial to him.

2

3

4

5   Lodg. Doc. 1 at 47 (emphasis in original, citation omitted).

6          As the state Court of Appeal recognized, the prosecutor committed misconduct in

7   asking petitioner whether the correctional witnesses were lying but found that trial counsel's

8   failure to object was not prejudicial. See United States v. Geston, 299 F.3d 1130, 1136 (9th Cir.

9   2002) (in federal criminal case, error for a witness to testify over objection that a witness was not

10  telling the truth); United States v. Sullivan, 85 F.3d 743, 750 (1st Cir. 1996) ("was the witness

11  lying" questions constitute misconduct because they invade the jury's task to resolve credibility

12  questions).

13         However, as the Court of Appeal recognized, petitioner was not prejudiced by

14  counsel's failure to object for several reasons. It is true that credibility of the opposing versions

15  of the events was central to the theory of the defense. However, the court instructed the jurors

16  that they were the sole judges of "the believability of a witness." RT 919. See United States v.

17  Boyd, 54 F.3d 868, 872 (D.C. Cir. 1995) (instruction to the jury one factor in preventing any

18  prejudice). Moreover, as the defense argued, "what the case is about" is credibility and "some

19  officers . . . came in here and did not tell the truth." RT 963, 968. The prosecutor's questions to

20  petitioner were a foreshadowing of trial counsel's argument to the jury. The Court of Appeal did

21  not apply federal law unreasonably in concluding there was no prejudice from counsel's failure

22  to object.

23  /////

24  /////

25  /////

26  /////

B. Arguing The Lack Of Evidence

In summation, the prosecutor argued:

> . . . We had some testimony about –and I think this was defendant talking about witnesses wanting to get him for some reason, and I submit to you where would the evidence be of that except for what defendant talked about?  There is none.
>
> . . . [I]f there is some evidence of misconduct of officers or other incidents of credibility, that evidence would be available to be brought to court and you didn't see any of it.  Keep that in mind when you think about the case.

RT 935-936.

The Court of Appeal found no impropriety in this argument because it found there had been no improper exclusion of evidence bearing on the officers' credibility:

> Defendant cites five instances in which the trial court excluded "evidence of misconduct or incidents involving credibility . . . at the urging of the prosecutor. . . . Of these five evidentiary rulings, defendant has raised only one as error on appeal–the ruling regarding the syringe incident.  However, we have previously held the court did not err in excluding . . . evidence regarding the syringe incident because defendant failed to demonstrate the incident was relevant.  Thus, for our purposes, all of the trial court's evidentiary rulings must be deemed proper.  Defendant fails to cite any authority that a prosecutor may not comment on the absence of evidence properly excluded, so long as he does not mislead the jury.
>
> Here, the prosecutor did not argue that any of the specific evidence the court excluded did not exist, which indeed would have been misleading.  Rather, the thrust of the prosecutor's argument was: (1) there was no evidence about witnesses wanting to "get" defendant except for defendant's own testimony; and (2) if there were evidence of misconduct of the officers or other incidents affecting their credibility, that evidence would have been available to be brought to court, but was not. . . .We are not convinced this argument was anything but fair comment on the state of the evidence.  Because the prosecutor's argument did not constitute misconduct, defense counsel's failure to object . . . did not constitute ineffective assistance of counsel.

Lodg. Doc. 1 at 53-55.

/////

/////

29

It may be error for a prosecutor to comment on the absence of evidence when the prosecutor has successfully prevented the defense from placing the evidence before the jury. Paxton v. Ward, 199 F.3d 1197, 1216-18 (10th Cir. 1999).  Nevertheless,

> a prosecutor may comment on the absence of evidence even when such evidence was available, but inadmissible, so long as there is sufficient evidence to support the prosecutor's version of events.

Menendez v. Terhune, 422 F.3d 1012, 1034 (9th Cir. 2005); Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).  In Menendez, the Ninth Circuit found no prosecutorial misconduct when the prosecutor argued that one defendant failed to call a mental health expert to bolster his claim of battered person syndrome after the evidence had been excluded because the defendant had not laid a proper foundation.  In this case as well, evidence of the hypodermic incident was excluded because the weakness of the offer of proof rendered the evidence irrelevant.  Because the prosecutor's argument was not improper, trial counsel was not ineffective in failing to object. People of the Territory of Guam v. Torre, 68 F.3d 1177, 1179-80 (9th Cir. 1995).  The state court's resolution of the issue did not violate federal law.

C.  Vouching

> In rebuttal, the prosecutor argued:

> . . . So, you'd have to believe . . . that Sergeant Phillips, for some unknown reason, went into the infirmary area, came up to Nurse Michelson and said, hey, we're going to get James Stull today. And Nurse Michelson would say, but I don't know James Stull. Well, I may have given him medicine once or twice.  No.  But we're gonna get him.  Yeah.  I don't know him and I could be convicted of perjury, I could lose my job, I could go to prison right here where I'm working but, yeah, it's too good.  I'm in on it.

> And then they went to Officer Roberts and they said, hey, we're gonna get James Stull today.  He's, like, I kinda like Jimmy Stull. If I do that, I could lose my job and I'd have to go to court and perjure myself and I could go to prison right here, but you're right. It's too good.  I'm in on it . . . .  Did they do that?  Come on.

RT 998.  Defense counsel did not object to this argument, yet raised it as misconduct in his unsuccessful motion for a new trial.  CT 313-316.

The appellate court did not find that the prosecutor's rebuttal argument constituted improper vouching:

> . . . By framing his argument as a hypothetical and using the word "could" instead of "would," the prosecutor avoided insinuating the existence of any undisclosed information, which is what makes vouching for a witness's credibility improper.  Because the prosecutor's argument did not amount to vouching, the argument was not improper, and defense counsel's failure to object to the argument was not deficient when measured against the standard of a reasonably competent attorney.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> The issue for us to decide is whether there is a reasonable probability defendant would have been acquitted of heroin possession if defense counsel had objected to this argument.  Our answer is, "no."   . . . [T]he prosecutor's argument did not insinuate the existence of undisclosed information bearing on Michelson's credibility.  It is nothing more than common sense to conclude that a prison employee caught lying about an inmate's possession of contraband "could" risk loss of her job and prosecution for perjury, however unlikely those consequences might be.  Further, we consider it unlikely the prosecutor's argument that Michelson would have considered the possible consequences of lying before deciding to participate in framing defendant for possessing heroin had any significant bearing on the jury's assessment of her credibility.  Also, contrary to defendant's suggestion, the record does not demonstrate that Michelson's credibility was the deciding factor in the jury's agreement that defendant possessed heroin on September 21.  Three officers . . . also testified to the discovery of the bindles in defendant's mouth on the 21st, and the jury's failure to agree that defendant possessed methamphetamine on September 25 does not reflect on the credibility of these officers because none of them was involved in the incident on the 25th.

Lodg. Doc. 1 at 50-52.

Federal courts have defined and then condemned a practice they have labeled as vouching:

> Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony.

United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993).  Courts have found improper

1  vouching when a prosecutor argued that the officers would not lie because they "risk losin' their

2  jobs, risk losin' their pension, risk losin' their livelihood and . . . they're riskin' bein' prosecuted

3  for perjury," United States v. Weatherspoon, 410 F.3d 1142, 1146 (9th Cir. 2005); when a

4  prosecutor told the jury that "you can be darn sure [the agent] would get fired for perjuring

5  himself." United States v. Combs, 379 F.3d 564, 568 (9th Cir. 2004); and when a prosecutor

6  argued that agents and U.S. Attorneys would not have coached witnesses because they would not

7  have "jeopardized our jobs, our careers, our right to practice law, they're [sic] right to continue as

8  FBI agents . . . ." United States v. Pungitore, 910 F.2d 1084, 1124 (3rd Cir. 1990).  But see

9  United States v. Hall, 370 F.3d 1204, 1209 (D.C. Cir. 2004) (no improper vouching when

10  argument that it was ridiculous to claim officers would lose their jobs came in rebuttal to defense

11  counsel's suggestion that officers' lies were motivated by desire not to risk their careers).

12          The Court of Appeal determined that the argument in this case was not improper

13  vouching because the prosecutor's use of the verb "could" rendered the scenario a hypothetical

14  rather than one based on the prosecutor's extra-record knowledge and so found that counsel had

15  not been ineffective in failing to object.  Lodg. Doc. 1 at 50.  It also found no prejudice from any

16  failure to object.

17          While the use of the verb "could" might not neutralize any vouching inherent in

18  the prosecutor's argument in this case, this court cannot find that the state Court of Appeal

19  applied federal law unreasonably in determining there was no reasonable probability that

20  petitioner would have been acquitted of the heroin charge had trial counsel objected.

21          Defense counsel argued that while there was no conspiracy against petitioner, the

22  witnesses who described seeing and removing the bindles from petitioner's mouth had set

23  petitioner up because "he's a persistent troublemaker; . . . he's had numerous problems with

24  drinking; . . . he's pissed people off. . . ."  RT 989-990.  He also argued that, as in any

25  hierarchical organization, "information can be provided and things can be created."  RT 990.  He

26  argued Sergeant Michaels' history with petitioner and Michaels' identification of the substance

petitioner excreted on October 4 as methamphetamine when it was probably Ibuprofen.  RT 972-974.  Nevertheless, his attack on the credibility of the four officers involved in the seizure of the bindles from petitioner's mouth on September 21 was fairly unfocused, for apart from his insinuation that word of petitioner's bad behavior was common knowledge in the institution and his suggestion that petitioner's testimony against Michaels was similarly known, defense counsel was unable to show that any of these four had the awareness that defense counsel argued gave them the motive to lie.  Because defense counsel's attack on the credibility of Michelson, Phillips, Roberts and Duke was not robust, it is not likely the prosecutor's rebuttal argument weighed much in the jury's evaluation of their overall testimony.

VII.  Extrinsic Material To The Jury (Appeal Issue VIII)

In addition to the substantive charge, the information in this case alleged that petitioner had suffered eighteen prior convictions, most of which were alleged to be strikes.  CT 11-16.  Trial on these prior convictions was bifurcated, to be addressed after a resolution of the substantive charge.  RT 182.  Nevertheless, an instruction listing the prior convictions and a verdict form for findings on the priors was included in the packet of written instructions provided to the jury with the substantive instructions.  CT 237-246.  The instruction and verdict form contained language to the effect that petitioner had not remained free of prison custody or had committed other felonies within five years after certain of the convictions, within the meaning of California Penal Code § 667.5(b).  See, e.g., CT 242.

When the jury returned the guilty verdict, the court informed its members there would be a further trial to determine the truth of the prior convictions; the jury asked to return the next day rather than begin the second phase of the trial on the afternoon the verdict was returned.  RT 1015-1017.  However, the next day, the prosecutor told the court that "if [petitioner] will admit the priors at the time of judgment and sentencing, I will not ask the Court to impose the three consecutive years for his one-year priors.  I will be asking the Court to impose the 25 to life. . . ."  RT 1021.  The defense concurred.  Id.  Accordingly, the court discharged the jurors and

1   informed them "that means you can talk to either of these attorneys about the case or about your

2   deliberations. . . ."  RT 1024.  Petitioner then admitted his prior convictions.  RT 1027-1035.

3         Although the record is not totally clear on the exact timing, the jury foreperson

4   met with the prosecutor "after verdict" and told him that the jury had been given some

5   instructions and the verdict form for the priors.  CT 322-323.  According to the prosecutor, "[t]he

6   juror did not indicate that the jury instruction information in any way affected the verdict, or that

7   the jury discussed Mr. Stull's priors in any way."  CT 323. The prosecutor notified defense

8   counsel who filed a motion for a new trial, based in part on the jury's receipt of these materials.

9   CT 317-318.

10         The trial court denied the motion, observing there was no prejudice because

11   defense counsel had asked petitioner about his prior convictions and that "[a]ll that the jury

12   received were mere allegations of the same priors that defendant had already admitted."  RT

13   1039A.  The court also found no prejudice because the evidence of petitioner's guilt was

14   overwhelming.  Id.

15         The Court of Appeal agreed:

16         Defendant contends the jury's receipt of the prior conviction
     information, despite the fact he had already
17         testified to all 18 convictions, because "[i]t is doubtful that the jury
     remembered exactly what he was convicted of" and "seeing 10
18         pages of prior convictions would have a much greater impact on a
     juror than [his] testimony."  This argument ignores that the jury
19         requested and received a read-back of all of defendant's testimony.
     Thus, the jury would have been able to compare defendant's
20         testimony to the information in the jury instruction packet and
     would have been able to determine the written information
21         reflected exactly the same 18 convictions defendant had admitted
     on the witness stand.
22

23         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

24         . . . [D]efendant contends he was prejudiced because the jury
     verdict forms for the prior conviction allegations were included in
25         the pages the jury mistakenly received, and this "made it obvious
     that [his] prior convictions had some legal significance."
26         Defendant contends the jury could have inferred the prior
     convictions were relevant to the three strikes law and might have

1    concluded he had 18 strikes, which could have had "a tendency to
     aggravate the prejudice inherent in other crimes evidence."  We are
2    not persuaded.  The jury was already aware of defendant's 18
     convictions–one each for assault with a deadly weapon, burglary,
3    and forgery, and 15 for robbery–from his own testimony.  Also, the
     jury was instructed it could consider a witness's felony convictions
4    "only for the purpose of determining the believability of that
     witness."  Defendant has given us no cause to believe the jury
5    disregarded that instruction just because verdict forms relating to
     the prior conviction allegations were included in the jury
6    instruction packet.

7    Lodg. Doc. 1 at 57-58 (emphasis in original).

8           When extrinsic information reaches a jury, a defendant's Sixth Amendment right

9    to a verdict based on the trial evidence may be compromised.  Jeffries v. Wood, 114 F.3d 1484,

10   1490 (9th Cir. 1997).  Potential prejudice from a jury's exposure to such information may be

11   diminished when "the extraneous information was otherwise admissible or merely cumulative of

12   other evidence adduced at trial" and when "a curative instruction was given or some other step

13   taken to ameliorate the prejudice. . . ."  Id. at 1491-92 (footnotes omitted).  "Juror awareness of a

14   defendant's past criminal record has long been recognized to be prejudicial."  Id. at 1490.

15          In United States v. Prime, 431 F.3d 1147 (9th Cir. 2005), the jury was given a

16   packet of exhibits that had been marked but not admitted into evidence; among these exhibits

17   were certified copies of the defendant's prior convictions.  When the court learned that this

18   material had been given to the jury, it gave a curative instruction and removed the exhibits.

19   Defendant's motion for a mistrial was denied.

20          The Ninth Circuit found no error:

21   The court . . . found that the jury had not reviewed the certified
     copies of convictions . . . .  Moreover, the court determined that
22   even if the jury had seen the reports, they would not have affected
     the verdict.  The only evidence in addition to the five felonies
23   Prime admitted to in his testimony was a conviction for the
     possession of an incendiary device.  If the jury had discovered this
24   evidence, it would not have affected the verdict because evidence
     introduced at trial established that Prime had in the past armed
25   himself with weapons and had obtained stun guns. . . .

26   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

35

> The extrinsic evidence given to the jury was cumulative and non-
> prejudicial, and the court gave proper curative instructions.
> Therefore, in light of the entire record, we conclude that the
> extrinsic evidence had no impact on the verdict.

Id. at 1157-58; see also Hughes, 898 F.2d at 701 (jury's exposure to extrinsic evidence harmless

when it was duplicative of evidence introduced in open court).

As in Prime, the jury was aware that petitioner had suffered eighteen prior

convictions because trial counsel elicited this information at the conclusion of his direct

examination. RT 732-733. Moreover, petitioner admitted that between 1976 and 1986, he had

not remained free of felony convictions for a period of five years. Id. Unlike in Prime, however,

the court did not learn of the problem while the jury was deliberating and so did not give a

curative instruction. During the general charge to the jury, the court instructed that it could use

evidence of a witness's felony convictions "only for the purpose of determining the believability

of that witness." RT 921. It is generally presumed that jurors follow the court's instructions

regarding whether, and in what respect, something can be considered evidence. See Aguilar v.

Alexander, 125 F.3d 815, 820 (9th Cir. 1997); see also Greer v. Miller, 483 U.S. 756, 767 n.8

(1987) (juries are presumed to follow instruction to disregard inadmissible evidence). Moreover,

nothing in the information before the trial court suggested that these instructions had any impact

on the verdict. Rather, even though the jury had the instruction and the verdict form on

petitioner's priors, it did not find he possessed methamphetamine on September 25.

Accordingly, the state court did not apply federal law unreasonably in determining petitioner was

not prejudiced by the jury's receipt of this information.

VIII.  Cumulative Error (Appeal Issue VII)

Petitioner argues that the cumulative impact of the errors discussed above denied

him a fair trial. The Court of Appeal rejected this argument because it had found no error. Lodg.

Doc. 1 at 58-59.

/////

1    "[T]he cumulative effect of several errors may prejudice a defendant to the extent

2    that his conviction must be overturned." Fuller v. Roe, 182 F.3d 699 (9th Cir. 1999).  As the

3    state Court of Appeal recognized, however, when there is no error or when any errors are

4    harmless, a claim of cumulative error is meaningless.  Similarly, this court's conclusion that

5    petitioner's claims of error are either baseless or harmless means that the state court's resolution

6    of the claim of cumulative error was proper.

7    IX.  Ineffective Assistance Of Appellate Counsel

8            The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

9    v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

10   However, an indigent defendant "does not have a constitutional right to compel appointed

11   counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

12   professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751

13   (1983).  Counsel "must be allowed to decide what issues are to be pressed." Id.  Otherwise, the

14   ability of counsel to present the client's case in accord with counsel's professional evaluation

15   would be "seriously undermined." Id.; see also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

16   Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

17   not even particularly good appellate advocacy.").  There is, of course, no obligation to raise

18   meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

19   showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

20   to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

21   context, petitioner must demonstrate that, but for counsel's errors, he probably would have

22   prevailed on appeal.  Id. at 1434 n.9.

23           The claims of ineffective assistance of appellate counsel were raised in the state

24   habeas petitions filed in the Court of Appeal and the Supreme Court, both of which were denied

25   in one-line orders.  Lodg. Docs. 7-10.

26   /////

37

A. <u>The Motion To Suppress (Habeas Issue I)</u>

Petitioner argues appellate counsel was ineffective for failing to argue on appeal that the search of petitioner's mouth and subsequent seizure of the bindles violated the Department of Corrections regulations, which require that such a search be conducted by a physician. He also urges that appellate counsel failed "to pursue the motion by appellant to suppress the illegal search and seizure." Pet. at 102. In reply to respondent's argument that a failure to follow correctional guidelines would not be a basis for suppression under California Proposition 8, petitioner argues that the failure to follow proper procedure constitutes a violation of his constitutional rights. Traverse at 7.

The latter claim is puzzling, for the record shows that trial counsel filed a motion to suppress the bindles of heroin and argued that the search violated the Fourth Amendment and 15 Cal. Code Regs. § 3287(b). <u>See</u> CT 88-95 (reply brief). Moreover, at the hearing on the motion to suppress, counsel argued both the Fourth Amendment and the regulations as bases for his motion, which was denied. RT 1-4. There was no basis for appellate counsel to argue that trial counsel had abandoned the motion to suppress. <u>See</u> <u>Rupe v. Wood</u>, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take a futile act can never be deficient performance).

Petitioner fares no better if his claim is construed as challenging appellate counsel's failure to raise the denial of the motion to suppress as an issue on appeal. The Supreme Court has defined <u>Strickland</u>'s prejudice prong when the allegation is a failure to litigate a motion to suppress:

> Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.

<u>Kimmelman v. Morrison</u>, 477 U.S. 365, 375 (1986); <u>see also</u> <u>Bailey v. Newland</u>, 263 F.3d 1022, 1029 (9th Cir. 2001). Petitioner cannot show that he would have succeeded in any appeal of the

1   denial of his motion to suppress evidence.

2          Petitioner has not alleged that the officers lacked reasonable suspicion that he

3   would possess drugs.  And when officers observe a suspect attempting to swallow drugs, they

4   may use reasonable force to prevent it.  United States v. Caldera, 421 F.2d 152, 153 (9th Cir.

5   1970); Espinoza v. United States, 278 F.2d 802, 804 (5th Cir. 1960); United States v. Holloway,

6   906 F.Supp. 1437, 1442 (D. Kan. 1995).  In this case, the bindles were extracted by MTA

7   Michelson using a tongue depressor, an action that does not rise to the level of outrageousness

8   necessary to establish a Fourth Amendment violation.  RT 256-258, 262; compare Rochin v.

9   California, 342 U.S. 165, 166, 174 (1952) (Fourth Amendment violated when police induced

10  vomiting in suspect who had swallowed drugs).

11         Petitioner fares no better in urging that the failure to raise the violation of

12  Corrections' policy was ineffective.  An officer's violation of regulations does not translate into a

13  violation of the Fourth Amendment or otherwise require suppression of evidence seized as a

14  result.  See United States v. Weiland, 420 F.3d 1062 (9th Cir. 2005), cert. denied, 547 U.S. 1114

15  (2006) (violation of Fed. R. Crim. P. 41 does not require suppression unless the violation arose to

16  the level of a constitutional violation); In re Lance W., 37 Cal. 3d 873, 886-87 (1985) (no

17  suppression of evidence taken in violation of state law or constitution unless suppression would

18  be federally compelled).  Appellate counsel's failure to raise the issue does not constitute

19  ineffective assistance of counsel.

20         B.  Failure To Raise Trial Counsel's Handling Of The Syringe Evidence
                (Habeas Issue II)

21

22         Petitioner argues that appellate counsel should have challenged trial counsel's

23  failure to present the hypodermic incident in a manner so as to ensure the evidence was presented

24  to the jury.  Pet. at 103.  In his traverse, he identifies Lieutenant Moore as the individual who

25  dismissed the rules violation against inmate Hill and then charged petitioner with possession of

26  the syringe.  Traverse at 13.

1    Defense counsel has a "duty to make reasonable investigations or to make a

2    reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at

3    691.  This includes a duty adequately to investigate and introduce into evidence records or

4    testimony that raise sufficient doubt to undermine confidence in the verdict.  Hart v. Gomez, 174

5    F.3d 1067, 1070 (9th Cir. 1999).  However, petitioner cannot bear his burden of showing

6    ineffective assistance of counsel by presenting "mere conclusory statements." United States v.

7    Schaflander, 743 F.2d 714, 721 (9th Cir. 1984).  Instead, the habeas petitioner must "state what

8    additional information would be gained by the discovery she or he now claims was necessary."

9    Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001).

10    Petitioner has identified Moore as the person responsible, but has not described

11    Moore's connection to the officers involved in the seizure of the bindles from petitioner's mouth

12    on September 21.  Accordingly, he has not demonstrated how counsel could have strengthened

13    the proffer so as to render the evidence admissible.  On this record, appellate counsel's failure to

14    raise this point was not improper.

15    C.  Defense Witness Ceasar (Habeas Issue III)

16    Petitioner argues that appellate counsel should have challenged what he

17    characterizes as the trial court's refusal to insist that defense witness Ceasar take the stand at

18    trial.

19    David Ceasar, an African-American, was on body cavity surveillance at the same

20    time as petitioner and testified in a pretrial hearing that he saw actions consistent with Machado's

21    placing an object in petitioner's feces on September 25.  RT 106, 108, 878.  Ceasar also testified

22    that no one took him seriously when he told people that petitioner was being framed.  RT 111,

23    871.

24    During trial, defense counsel informed the court that Ceasar was not willing to

25    testify.  RT 643.  He later told the court that Ceasar felt threatened and wanted assurances he

26    would be housed at the county jail rather than at the prison and would not be returned to Salinas

1  Valley State Prison.  RT 788.  The court agreed that his testimony could be read to the jury and

2  informed the jury that Ceasar was unavailable as a witness.  RT 864-865.

3        Petitioner contends that the trial court had a duty to ensure Ceasar's safety so that

4  the jury could see Ceasar.  This was crucial, he contends, because Ceasar, who is African-

5  American, supported petitioner, a Caucasian, even though "it is well known thing that black and

6  white prisoners do not associate with each other."  Traverse at 21.

7        Even if a trial court has an obligation to ensure a witness's safety, a proposition

8  petitioner has failed to support with any authority, petitioner has not shown any prejudice from

9  the reading of Ceasar's testimony.  Because his entire testimony was read, the jury heard his

10  description of Machado's appearing to take something from his pocket and deposit it in the bag

11  of petitioner's feces and his determination to inform not only petitioner but also correctional

12  officers of these things.

13        Moreover, Ceasar's absence from the courtroom did not prevent petitioner from

14  suggesting, as he does now, that the fact Ceasar was willing to cross racial lines shows the

15  credibility of his story:  officers testified that Ceasar was African-American, <u>see</u>, <u>e.g.</u>, RT 715,

16  and nothing prevented petitioner developing, through his own testimony or that of some of the

17  officers, the theme of racial differentiation in the institution and its impact on inmates' motives

18  and biases.

19        D.  <u>The Failure To Challenge The Sentence On Appeal (Habeas Issue IV)</u>

20        Petitioner argues appellate counsel was ineffective in failing to challenge his

21  sentence as a violation of the Eighth Amendment.  Because this argument would have been

22  rejected, counsel's failure to raise it was not deficient.

23        In <u>Lockyer v. Andrade</u>, <u>supra</u>, the Supreme Court considered California's Three

24  Strikes law and the interaction of the AEDPA and the Court's Eighth Amendment jurisprudence.

25  The Court recognized the lack of clarity in its earlier Eighth Amendment cases but described the

26  "governing legal principle" in Eighth Amendment cases to be "gross disproportionality."

1   Lockyer, 538 U.S. at 72.  The Court ultimately found the California Court of Appeal had not

2   applied federal law in an unreasonable fashion or reached a result contrary to federal precedent

3   on indistinguishable facts.  Id. at 74.  As a result, it upheld Andrade's sentence of fifty-years-to-

4   life following his convictions for two counts of grand theft stemming from two incidents of

5   shoplifting and the findings he had suffered three prior convictions for residential burglary.  Id. at

6   65.  His record also included two federal drug convictions, a federal escape charge and some

7   misdemeanor thefts.  Id. at 66-67.

8          In evaluating whether petitioner's sentence violates the Eighth Amendment, an

9   appellate court must consider the severity of the offense, the availability of parole and length of

10  sentence, and the impact of recidivism.  Id. at 72.

11         Here, although petitioner possessed only a small quantity of drugs, his case is not

12  one of simple possession--his offense required planning and coordination in an effort to ensure

13  the contraband was smuggled through security and searches into a place where it clearly was not

14  permitted.  In fact, in Hutto v. Davis, 454 U.S. 370, 372 n.1 (1982), the Court reversed the lower

15  court's grant of a habeas petition, in effect upholding a forty year sentence for the possession of

16  nine ounces of marijuana, when the evidence developed at trial showed the defendant was a drug

17  dealer who "had knowingly sold drugs to be smuggled into prison . . . and had himself been

18  imprisoned in the past."

19         In this case, the sentence is undoubtedly severe.  Although petitioner has a chance

20  for parole after serving twenty five years of his sentence,[7] the reality for petitioner, a fifty-four

21  year old man, is that it is highly likely he will not be paroled.  CT 360 (petitioner's date of birth

22  is 2/17/54); contrast Rummel v. Estelle, 445 U.S. 263, 280 (1980) (life sentence for small theft

23  ameliorated by Texas policy of liberal grant of good time that might make person eligible for

24  parole in twelve years).  Nevertheless, the severity of the sentence alone will not make it grossly

25

26         [7] A third striker is not permitted to earn custody credits against his minimum sentence.
    In re Cervera, 24 Cal.4th 1073 (2001).

1  disproportionate.  Harmelin v. Michigan, 501 U.S. 957 (1991) (sentence of life without the

2  possibility of parole for possession of large amount of drugs did not violate Eighth Amendment).

3         The final consideration is the impact of petitioner's recidivism.  As the probation

4  officer noted, petitioner "has been a California State Prison inmate, off and on, since 1976."

5  CT 368.  He was incarcerated for his numerous robbery convictions at the time he committed this

6  offense and had committed the robberies after earlier periods of incarceration.  CT 361-363.  As

7  the Supreme Court said in Rummel:

8               One in Rummel's position has been both graphically informed of
             the consequences of lawlessness and given an opportunity to
9               reform, all to no avail. Article 63 [the Texas recidivist statute] thus
             is nothing more than a societal decision that when such a person
10               commits yet another felony, he should be subjected to the
             admittedly serious penalty of incarceration for life, subject only to
11               the State's judgment as to whether to grant him parole.

12  Rummel, 445 U.S. at 278.

13         Petitioner also argues appellate counsel should have challenged his sentence on

14  the ground he was eligible for lenient sentencing under California's Proposition 36.  That

15  proposition has been enacted as California Penal Code § 1210.1(b)(1), which provides in part

16  that a defendant is ineligible for Proposition 36 treatment, if the "defendant . . . previously has

17  been convicted of one or more serious or violent felonies in violation of subdivision (c) of

18  Section 667.5 or Section 1192.7, unless the nonviolent drug possession offense occurred after a

19  period of five years in which the defendant remained free of both prison custody and the

20  commission of an offense that results in (A) a felony conviction other than a nonviolent drug

21  possession offense, or (B) a misdemeanor conviction involving physical injury or the threat of

22  physical injury to another person."

23         In this case, petitioner admitted that fifteen of his prior convictions were serious

24  or violent felonies and he certainly had not been free of prison custody for the five years before

25  the drug offense.  RT 1028-1034.

26  /////

1       With this law as a background, it cannot be said that appellate counsel was

2 ineffective for failing to challenge petitioner's sentence on appeal.

3       E.  Petitioner's Admission Of His Priors (Habeas Issue V)

4       As noted above, after the guilty verdict, the prosecutor agreed to strike the

5 allegation that three of petitioner's priors were "prison priors," which would have added an

6 additional three years to petitioner's sentence, in exchange for petitioner's admitting his strikes.

7 RT 1021.

8       Petitioner argues that this deal was somehow inappropriate because the prosecutor

9 was aware the jury had been given the instruction and verdict form on his priors at the time he

10 made the offer.  Pet. at 106.  Prosecutorial misconduct may render a guilty plea involuntary.

11 Wells v. Maass, 28 F.3d 1005, 1011 (9th Cir. 1994).  However, petitioner has not shown any

12 misconduct because he has not established its factual predicate–that the prosecutor was aware the

13 jury had been given the information at the time he made the offer to petitioner.  The record

14 suggests the prosecutor did not hear from the jury foreperson until after petitioner admitted his

15 prior convictions, for it was only after the verdict that the jury was released from its admonition

16 not to talk to counsel, RT 1024, and the admissions were taken immediately after the verdict was

17 announced.  RT 1027-1035.  This court assumes the jury heeded the no-contact instruction until

18 the court formally rescinded the prohibition.  Weeks v. Angelone, 528 U.S. 225, 234 (2000)

19 (juries are presumed to follow instructions).  Appellate counsel was not ineffective in failing to

20 raise this issue.

21       F.  Trial Court Error (Habeas Issues VI & VII)

22       Petitioner argues appellate counsel should have faulted the trial court instead of

23 the prosecutor for allowing petitioner to be asked whether prosecution witnesses were lying.  Pet.

24 at 107.  He also contends appellate counsel should have classified the questioning about the

25 subsequent body cavity surveillance as trial court error rather than prosecutorial misconduct.  Pet.

26 at 108.

1    As noted above, however, any error in the "are the witnesses lying" line of

2 questions did not have a substantial and injurious effect on the verdict, so petitioner cannot

3 establish he would have secured relief had appellate counsel recharacterized the issue.

4    Moreover, appellate counsel did argue that "the trial court erred in allowing the

5 prosecutor to cross-examine appellant about . . . a subsequent body cavity surveillance."  Lodg.

6 Doc. 2 at 68, 72-75.  This argument thus is frivolous.

7    G.  Cumulative Error (Habeas Issue VIII)

8    Petitioner claims that appellate counsel failed to argue that the cumulative effect

9 of the errors denied him due process.  Pet. at 109.  This, too, is frivolous: appellate counsel raised

10 such a challenge.  Lodg. Doc. 2 at 99–101.

11    IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

12 habeas corpus be denied.

13    These findings and recommendations are submitted to the United States District

14 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

15 days after being served with these findings and recommendations, any party may file written

16 objections with the court and serve a copy on all parties.  Such a document should be captioned

17 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

18 shall be served and filed within ten days after service of the objections.  The parties are advised

19 that failure to file objections within the specified time may waive the right to appeal the District

20 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

21 DATED:  January 22, 2009.

22

23    _____

24    U.S. MAGISTRATE JUDGE

25 2

26 stul1762.157

45